IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| JEWELL A. SCRIVNER, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v.  ) | Case No. 12-CV-36-PJC |
| ) | |
| CAROLYN W. COLVIN, ) | |
| Acting Commissioner of the ) | |
| Social Security Administration,[1] ) | |
| ) | |
| Defendant. ) | |

**OPINION AND ORDER**

Claimant, Jewell A. Scrivner ("Scrivner"), pursuant to 42 U.S.C. § 405(g), requests judicial review of the decision of the Commissioner of the Social Security Administration ("Commissioner") denying her applications for disability insurance benefits and supplemental security income benefits under the Social Security Act, 42 U.S.C. §§ 401 *et seq*. In accordance with 28 U.S.C. § 636(c)(1) and (3), the parties have consented to proceed before a United States Magistrate Judge. Any appeal of this order will be directly to the Tenth Circuit Court of Appeals. Scrivner appeals the decision of the Administrative Law Judge ("ALJ") and asserts that the Commissioner erred because the ALJ incorrectly determined that Scrivner was not disabled. For the reasons discussed below, the Court **REVERSES AND REMANDS** the Commissioner's decision.

---

[1] Pursuant to Fed. R. Civ. P. 25(d)(1), Carolyn W. Colvin, the current Acting Commissioner of the Social Security Administration, is substituted for Michael J. Astrue as Defendant in this action. No further action need be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

**Claimant's Background**

Scrivner was 47 years old at the time of the hearing before the ALJ on December 15, 2009. (R. 21, 35). She did not graduate from high school, and she had never gotten a GED. (R. 36). She had certifications as a CNA, CMA, and MAT. *Id.* Scrivner had worked as a cook at several jobs within 15 years before the hearing. (R. 27-35). She had worked as a medical assistant technician, passing out medications and doing other tasks such as laundry. (R. 33-34). Her last job was as a cook, and she left after about one month because she was having a lot of migraines, her feet were swelling, and she was having back trouble. (R. 34-35).

Scrivner testified that she had weighed 147 pounds in May 2007, and she weighed 268 pounds at the time of the December 2009 hearing. (R. 35). She said that she used a cane about three or four times a month because of a weak left leg. (R. 35-36). She said that she fell about three times a month. (R. 38). She was often dizzy, and she had a headache, and sometimes those conditions led to a fall. (R. 38-39). She testified that she stumbled every day. (R. 40). When she had a headache, she would take three Tylenol pills and lie down in a dark place, and that would sometimes help. (R. 39). Sometimes, she would need to go to her doctor or to the emergency room to get medication to get relief. *Id.* Scrivner testified that she tried to take a nap of 45 minutes to an hour every afternoon, especially if she was getting a migraine. (R. 42-43).

She had previously taken blood pressure medication, but she was not taking it at the time of the hearing. (R. 39). She monitored her blood pressure regularly, however, and sometimes it was high. *Id.*

Scrivner estimated that she could sit for about 45 minutes to an hour before her back would hurt and her legs would start tingling. (R. 40). She would then stand up, walk around, and perhaps use a heating pad, but those measures did not always help. *Id.* She could probably sit back down after five or ten minutes. *Id.*

Scrivner testified that she did not stand much because her ankles were swollen every morning. (R. 41). Her usual position was to sit in a recliner, which she did for about four hours a day. (R. 41-42). She could stand in order to do chores for about ten minutes, and then she would need to sit down for ten minutes. (R. 41). She also often experienced headaches and dizziness when she stood. *Id.* Scrivner walked her dog out to her mailbox and perhaps down the sidewalk a bit. (R. 42). When she came back in the house, Scrivner would need to sit down because she would be out of breath. *Id.*

She sometimes had trouble getting out of bed because of her lower back, and she would need help. (R. 43-44). Squatting, bending, or kneeling would hurt her knees and her back, and she would need assistance, such as using a table, to get back up. (R. 44). She could lift her 12-pound dog without causing severe pain. *Id.* Her hands tingled all of the time, and they were numb sometimes. (R. 44-45). She liked to crochet, and sometimes she could do it for 30 minutes before her hands would cramp. (R. 45).

Scrivner testified that she was having trouble turning her neck to the left. (R. 46). She drove only rarely because of this. (R. 46-47). She would not even attempt reaching overhead, such as trying to change a light bulb, because it would hurt her neck and her back. (R. 50-51). She testified that she modified the way she put her t-shirt on, because it would hurt if she put her arms over her head. (R. 51). She had no trouble reaching forward. *Id.*

3

Scrivner said that she had previously been told in 2003 that she had a stroke, and in 2005 or 2006, she had been treated with a heart catheterization. (R. 47). Since then, she had been to the emergency room for chest pain, but she had been told that tests were normal. (R. 47-48). The physicians had come to the conclusion that her chest pain was a result of panic attacks. *Id.*

Scrivner took Remeron every night to help her sleep, but sometimes she would sleep only four hours, while on a good night she would sleep for eight. (R. 43). She sometimes felt rested in the morning, and she sometimes felt groggy and tired. *Id.*

While Scrivner had previously worked as a cashier, she did not think she could return to that work, because she would have trouble concentrating and giving correct change. (R. 37). While she had previously found it easy to remember phone numbers, at the time of the hearing she could not remember them, and she could not remember dates any more. (R. 50).

Some days, Scrivner did not want to leave the house. (R. 46). While she previously had always dressed nicely, along with fixing her hair and makeup, and at the time of the hearing, she wore sweats and t-shirts, and she did not fix her hair and makeup. *Id.* About two or three days a week, she did not leave her house, other than to walk to the mailbox. *Id.*

Scrivner testified that she had discussed panic attacks with staff at Family & Children's Services ("F&CS"). (R. 48-49). She was also treated there for mood stabilization, and they had recently increased her medications. (R. 49). She took medication for depression and anxiety. *Id.* She had side effects of dry mouth, nausea, and "jittery" feelings. (R. 49-50).

Scrivner testified that the last time she used illegal drugs was earlier in 2009 when she smoked marijuana because she was out of pain medication. (R. 51). She had a criminal history, and she thought the last time she was in jail was in 2007. *Id.* She smoked about half a pack of cigarettes a day, and she was trying to quit. (R. 52). She felt that smoking helped her calm down. *Id.*

Scrivner presented to the emergency room at Valley View Regional Hospital in Ada, Oklahoma ("Valley View Hospital") on November 17, 2004 with a swollen and painful left knee. (R. 216-21). The assessment was knee sprain, and Scrivner was given pain medication. (R. 221).

On April 24, 2005, Scrivner presented to Valley View Hospital with a migraine headache. (R. 222-28). She was given shots of Nubain and Phenergan. (R. 225). She returned on May 15, 2005 after falling at work. (R. 229-30). She was apparently not in the lobby when they called for her. *Id.* She returned again on July 7, 2005, complaining of shortness of breath and coughing. (R. 231-47). She was diagnosed with bronchitis and given Zithromax and prednisone. (R. 244). On July 26, 2005, she returned with shortness of breath and tightness of her chest. (R. 248-61). She gave a history of a heart attack 18 months earlier and a stroke in 2003. (R. 249). Diagnoses were anxiety and depression, and Scrivner was prescribed Paxil. (R. 261).

Scrivner presented to the emergency room at St. John Medical Center on August 8, 2005. (R. 284-94). She complained of low back pain, together with numbness and tingling of her left leg. (R. 288). She returned on September 3, 2005 with chest pain. (R. 295-305). All cardiac studies were negative. (R. 296).

Scrivner was seen at the emergency room at Hillcrest Medical Center ("Hillcrest") on October 21, 2005 with chest pain. (R. 535-49). Scrivner stated that she had a stroke in 2003 and

four heart attacks since that time. (R. 536). She also said that she had fainted numerous times. *Id.* She said she had used methamphetamine, but had "been clean" for one year. *Id.*

Scrivner returned to Hillcrest on November 26, 2005 with shortness of breath after an altercation. (R. 526-34). Scrivner apparently told hospital staff that she had been drinking and that she had not been taking her medications for bipolar disorder and anxiety. *Id.*

Scrivner returned to Hillcrest on January 10, 2006 with chest pain. (R. 515-25). On January 19, 2006, Scrivner left without being seen. (R. 512-14). She apparently left again when she returned to Hillcrest on March 5, 2006. (R. 509-11). Scrivner returned to Hillcrest on May 25, 2006 with chest pain. (R. 494-508). She was apparently released after all laboratory tests were normal. *Id.* Scrivner returned on July 1, 2006 for injuries from being thrown to the ground. (R. 486-493). She was assessed with a head contusion and discharged. *Id.*

Scrivner presented to Valley View Hospital on July 23, 2006 with foot pain. (R. 262-74). She was diagnosed with a sprained foot and prescribed Motrin and Talwin. (R. 274). She returned on October 26, 2006 with shortness of breath and was diagnosed with bronchitis. (R. 275-82).

Scrivner presented to Hillcrest on July 11, 2007 with chest pain. (R. 459-85). Discharge diagnosis was noncardiac chest pain. (R. 460). She was given numerous prescriptions and instructed to follow up with her primary care physician. *Id.*

It appears that Scrivner saw a case manager at F&CS in May 2006. (R. 414). She apparently did not return to F&CS until August 20, 2007, when she saw Kristy Griffith, M.D. (R. 413). Dr. Griffith's diagnoses were bipolar I disorder, most recent episode depressed, mild;

amphetamine and other psychostimulant dependence; and nondependent abuse of drugs.[2] *Id.* She prescribed Depakote and Vistaril. *Id.*

Scrivner was seen at CliniCo Rural Health Clinic in Beggs, Oklahoma from time to time between October 2, 2007 and May 28, 2008. (R. 415-49). A record dated July 3, 2007 states that Scrivner was not on medications, but wanted to resume them. (R. 447). She complained of chest pain due to stress, and stated that she had a stroke in 2003 and four heart attacks after that time. *Id.* The hand-written notes are not clear, but it appears that she was prescribed Depakote, Klonopin, and Vistaril. *Id.* On May 28, 2008, Scrivner was dismissed from the care of the clinic in part because she was found to be disruptive and abusive. (R. 417).

Scrivner presented to St. John Sapulpa on October 30, 2007 with right knee pain and swelling. (R. 335-44). X-rays showed degenerative changes with decrease in the medial compartment space, but no acute fractures. (R. 344). She was prescribed Lortab and crutches. (R. 342). She returned on December 5, 2007 with neck pain. (R. 327-34). She was given an injection of morphine. (R. 334).

Scrivner presented to St. John Sapulpa on March 31, 2008 and was transferred to St. John Medical Center on April 2, 2008 with what the physician characterized as "somewhat atypical chest pain for a non-anginal-type chest pain." (R. 306-25, 388-401). Discharge diagnoses were noncardiac chest pain, anxiety disorder, bipolar disorder, gastroesophageal reflux, depression, extensive tobacco use, and history of polysubstance abuse. (R. 306). The treating physician noted that Scrivner said she was not taking medication for her mental health issues, and he also

---

[2] Dr. Griffith used numerical codes to express her diagnoses. These codes are from the International Classification of Diseases, 9th edition - Clinical Model coding system, and this is a medically-recognized ranking of diagnoses. *See Little Company of Mary Hosp. v. Shalala*, 24 F.3d 984, 986-87 (7th Cir. 1994).

suspected that there was a "component of drug-seeking behavior" in Scrivner's hospital stay. (R. 307). Diagnostic tests were negative. (R. 306-25).

Scrivner presented to St. John Sapulpa on April 14, 2008 with chest pain that she said had continued after her evaluation at St. John Tulsa. (R. 376-87). She was given injections of Toradol and morphine. (R. 383). She returned to St. John Sapulpa two days later on April 16, 2008 with neck and back pain that she said resulted from a fall. (R. 362-75). CT imaging of the head and x-rays of her thoracic spine were negative. (R. 372-73). X-rays of her lumbar spine showed no fracture. (R. 374). Scrivner returned on April 19, 2008 and complained of continuing neck and back pain. (R. 354-61). She was given shots of morphine, Toradol, and Norflex. (R. 358).

Scrivner presented to Hillcrest on April 23, 2008, complaining of having fallen. (R. 451-58).

Scrivner returned to St. John Sapulpa on May 3, 2008 with a right ankle injury. (R. 345-53). X-rays showed no fracture and no "conspicuous soft tissue swelling." (R. 353).

Scrivner saw Autumn Miller - PAC at the OU Bedlam Clinic on May 13, 2008 to establish as a new patient following her hospital stay. (R. 402).

Scrivner saw Dr. Griffith at F&CS on May 22, 2008, and her diagnoses were bipolar I disorder, most recent episode mixed, mild; and "phobic disorders." (R. 409, 672). Dr. Griffith prescribed Geodon and Vistaril. *Id.*

Scrivner returned to St. John Sapulpa on May 24, 2008 complaining of chest pain. (R. 606-21). A CT angiogram was unremarkable. (R. 619). Scrivner returned on May 27, 2008 with a headache. (R. 630-37).

Scrivner saw Dr. Griffith at F&CS on June 12, 2008 and stated that she was doing better. (R. 673). Her medications were continued, and Vistaril was increased to address continuing anxiety. *Id.* Diagnoses were stated as bipolar disorder, most recent episode mixed, mild; amphetamine and other psychostimulant dependence; and nondependent abuse of drugs. *Id.*

Scrivner returned to St. John Sapulpa on July 18, 2008 with a headache. (R. 622-29). She was given injections of Norflex and morphine. (R. 626). She returned on July 30, 2008, stating that she had a migraine and that she could not be seen by her regular doctor until the next week. (R. 638-45). She was administered Benadryl, Compazine, and Toradol. (R. 642). She returned on August 8, 2008 with a migraine. (R. 646-53). She was administered Benadryl, Compazine, and Toradol. (R. 653).

Scrivner saw Dr. Griffith at F&CS on September 18, 2008, and she was doing fine on her medications, but she was having chest pain and shortness of breath. (R. 676). Her medications were continued, and her diagnosis was given as bipolar disorder, most recent episode depressed, mild. *Id.* An ambulance was called so that her chest pain symptoms could be evaluated. *Id.* Scrivner was taken by ambulance to the Oklahoma State University Medical Center (the "OSU Hospital"). (R. 584-95). Laboratory tests were negative for cardiac issues, and the physicians determined that her chest pain was musculoskeletal in nature. (R. 591).

Scrivner returned to St. John Sapulpa on September 23, 2008 with right foot and ankle pain, stating that she had stepped in a hole. (R. 654-63). She was given an injection of Toradol. (R. 658).

Scrivner was seen by Dr. Griffith at F&CS on November 6, 2008, and she said that she was doing well. (R. 677). Her medications and diagnosis were continued. *Id.*

9

Scrivner was admitted to the OSU Hospital on January 20, 2009 after reporting an episode of vomiting and fainting. (R. 686-98). She admitted marijuana use. (R. 693).

Scrivner was admitted to the OSU Hospital on February 23, 2009 after a suicide attempt by overdose of prescription medications. (R. 699-713). In giving her history, she admitted to a history of abuse of methamphetamine, but claimed she had been free of any drug use for years. (R. 699). She admitted that she smoked marijuana. (R. 708). Diagnostic impressions on discharge were bipolar disorder, not otherwise specified and cannabis abuse. (R. 700). The physician assessed Scrivner's current GAF as 40, with a highest GAF in the past year of 55. *Id.*

Scrivner saw Dr. Griffith at F&CS on March 2, 2009 and told her about the OSU Hospital stay. (R. 717, 745). Scrivner said she was not doing well and thought that her medications weren't working. *Id.* Dr. Griffith diagnosed Scrivner with bipolar disorder, most recent episode mixed, mild; anxiety not otherwise specified; amphetamine and other psychostimulant dependence; and nondependent abuse of drugs. *Id.* Dr. Griffith changed Scrivner's medications. *Id.*

Scrivner had an initial consultation with Oklahoma State University's OMM outpatient clinic (the "OMM Clinic") on March 26, 2009 to address low back pain. (R. 797-98).

Scrivner saw Jeffrey Cates, D.O. at F&CS on June 11, 2009 and stated that her medications were not working. (R. 743). Dr. Cates adjusted her medications to address issues of mood swings and poor sleep. *Id.*

Scrivner presented to St. John Sapulpa after a fainting episode on June 28, 2009. (R. 748-60). She was given an injection of Toradol. (R. 752).

Scrivner returned to F&CS and was seen by Dr. Griffith on July 2, 2009, and her medications were again adjusted. (R. 742). Scrivner saw Dr. Griffith at F&CS on October 28,

2009, and she complained of mood swings and lack of sleep. (R. 741). Dr. Griffith adjusted Scrivner's medications. *Id.*

Scrivner was seen at the OMM Clinic on January 21, 2010. (R. 795-96).

Scrivner saw Dr. Griffith on February 4, 2010, and Dr. Griffith continued Scrivner's diagnoses. (R. 791). The dosage of Remeron was increased to help with sleep and anxiety. *Id.*

Agency consultant Jeri Fritz, Ph.D., completed a mental status examination of Scrivner on August 13, 2008. (R. 550-55). Memory, attention, and concentration appeared intact. (R. 552). Insight was fair, but she did not demonstrate abstract cognition. *Id.* Dr. Fritz stated that Scrivner could understand, retain, and follow directions, and she would be able to perform simple, repetitive tasks. *Id.* Her ability to relate to others was estimated to be fair. *Id.* Her ability to handle stress was judged to be fair. *Id.* Dr. Fritz's Axis I[3] diagnosis was bipolar disorder, most recent episode depressed (by history), and she estimated her global assessment of functioning ("GAF")[4] as 60. (R. 553).

Agency nonexamining consultant Janice B. Smith, Ph.D., completed a Psychiatric Review Technique form and a Mental Residual Functional Capacity Assessment dated

---

[3] The multiaxial system "facilitates comprehensive and systematic evaluation." American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 27 (Text Revision 4th ed. 2000) (hereafter "DSM IV").

[4] The GAF score represents Axis V of a Multiaxial Assessment system. *See* DSM IV at 32-36. A GAF score is a subjective determination which represents the "clinician's judgment of the individual's overall level of functioning." *Id*. at 32. The GAF scale is from 1-100. A GAF score between 21-30 represents "behavior is considerably influenced by delusions or hallucinations or serious impairment in communication or judgment . . . or inability to function in almost all areas." *Id*. at 34. A score between 31-40 indicates "some impairment in reality testing or communication . . . or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood." *Id*. A GAF score of 41-50 reflects "serious symptoms . . . or any serious impairment in social, occupational, or school functioning." *Id*.

September 4, 2008. (R. 556-73). On the Psychiatric Review Technique form, for Listing 12.04, Dr. Smith noted Scrivner's bipolar disorder. (R. 559). For Listing 12.09, Dr. Smith noted behavioral changes or physical changes associated with the regular use of substances that affect the central nervous system. (R. 564). For the "Paragraph B Criteria,"[5] Dr. Smith found that Scrivner had moderate restriction of activities of daily living, moderate difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence, or pace. (R. 566). She noted one or two episodes of decompensation. *Id.* In the "Consultant's Notes" portion of the form, Dr. Smith briefly summarized Scrivner's history of outpatient mental health treatment and Dr. Fritz's evaluation. (R. 568).

On the Mental Residual Functional Capacity Assessment, Dr. Smith found that Scrivner was moderately limited in her ability to understand, remember, and carry out detailed instructions. (R. 570). She also found that Scrivner was moderately limited in her ability to interact appropriately with the general public. (R. 571). Dr. Smith said that Scrivner could understand, remember and carry out non-complex instructions. (R. 572). Scrivner could interact with others at least superficially for work purposes, and she could tolerate occasional interaction with the general public. *Id.* She could adapt to most routine workplace changes. *Id.*

Nonexamining agency consultant Luther Woodcock, M.D. completed a Physical Residual Functional Capacity Assessment on September 5, 2008. (R. 574-81). Dr. Woodcock found that

---

[5] There are broad categories known as the "Paragraph B Criteria" of the Listing of Impairments used to assess the severity of a mental impairment. The four categories are (1) restriction of activities of daily living, (2) difficulties in maintaining social functioning, (3) difficulties in maintaining concentration, persistence or pace, and (4) repeated episodes of decompensation, each of extended duration. Social Security Ruling ("SSR") 96-8p; 20 C.F.R. Part 404 Subpt P, App. 1 ("Listings") §12.00C. *See also Carpenter v. Astrue*, 537 F.3d 1264, 1268-69 (10th Cir. 2008).

Scrivner had the exertional capacity to perform medium work. (R. 575). For narrative explanation, Dr. Woodcock stated that all chest pains had been determined to be non-cardiac. *Id.* While Scrivner had complained of back pain, two different sets of x-rays were normal. *Id.* Knee x-rays showed mild degenerative changes. *Id.* Dr. Woodcock found no other limitations. (R. 576-81).

## Procedural History

Scrivner filed applications dated May 14, 2008 seeking disability insurance benefits and supplemental security income benefits under Titles II and XVI, 42 U.S.C. §§ 401 *et seq.* (R. 130-42). Scrivner alleged onset of disability as of October 1, 2006. (R. 135). The applications were denied initially and on reconsideration. (R. 70-84). A hearing before ALJ Deborah L. Rose was held December 15, 2009 in Tulsa, Oklahoma. (R. 21-58). By decision dated February 16, 2010, the ALJ found that Scrivner was not disabled. (R. 12-20). On December 2, 2011, the Appeals Council denied review of the ALJ's findings. (R. 1-6). Thus, the decision of the ALJ represents the Commissioner's final decision for purposes of this appeal. 20 C.F.R. §§ 404.981, 416.1481.

## Social Security Law and Standard of Review

Disability under the Social Security Act is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment." 42 U.S.C. § 423(d)(1)(A). A claimant is disabled under the Act only if his "physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work in the national economy." 42 U.S.C. § 423(d)(2)(A). Social Security regulations implement a five-step sequential process to evaluate a disability

claim. 20 C.F.R. § 404.1520.[6] *See also Williams v. Bowen*, 844 F.2d 748, 750 (10th Cir. 1988) (detailing steps). "If a determination can be made at any of the steps that a claimant is or is not disabled, evaluation under a subsequent step is not necessary." *Id.*

Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. § 405(g). This Court's review is limited to two inquiries: first, whether the decision was supported by substantial evidence; and, second, whether the correct legal standards were applied. *Hamlin v. Barnhart*, 365 F.3d 1208, 1214 (10th Cir. 2004) (quotation omitted).

Substantial evidence is such evidence as a reasonable mind might accept as adequate to support a conclusion. *Id.* The court's review is based on the record taken as a whole, and the court will "meticulously examine the record in order to determine if the evidence supporting the agency's decision is substantial, taking 'into account whatever in the record fairly detracts from its weight.'" *Id., quoting Washington v. Shalala*, 37 F.3d 1437, 1439 (10th Cir. 1994). The court "may neither reweigh the evidence nor substitute" its discretion for that of the Commissioner. *Hamlin,* 365 F.3d at 1214 (quotation omitted).

---

[6] Step One requires the claimant to establish that he is not engaged in substantial gainful activity, as defined by 20 C.F.R. § 404.1510. Step Two requires that the claimant establish that he has a medically severe impairment or combination of impairments that significantly limit his ability to do basic work activities. *See* 20 C.F.R. § 404.1520(c). If the claimant is engaged in substantial gainful activity (Step One) or if the claimant's impairment is not medically severe (Step Two), disability benefits are denied. At Step Three, the claimant's impairment is compared with certain impairments listed in 20 C.F.R. Pt. 404, Subpt. P, App.1 ("Listings"). A claimant suffering from a listed impairment or impairments "medically equivalent" to a listed impairment is determined to be disabled without further inquiry. If not, the evaluation proceeds to Step Four, where the claimant must establish that he does not retain the residual functional capacity ("RFC") to perform his past relevant work. If the claimant's Step Four burden is met, the burden shifts to the Commissioner to establish at Step Five that work exists in significant numbers in the national economy which the claimant, taking into account his age, education, work experience, and RFC, can perform. *See Dikeman v. Halter*, 245 F.3d 1182, 1184 (10th Cir. 2001). Disability benefits are denied if the Commissioner shows that the impairment which precluded the performance of past relevant work does not preclude alternative work. 20 C.F.R. § 404.1520.

### Decision of the Administrative Law Judge

The ALJ found that Scrivner met insured status through June 30, 2011. (R. 14). At Step One, the ALJ found that Scrivner had not engaged in any substantial gainful activity since her alleged onset date of October 1, 2006. *Id*. At Step Two, the ALJ found that Scrivner had severe impairments of "combination of mild degenerative changes in the knees, non-cardiac chest pain, obesity, hypertension, bipolar disorder, and history of polysubstance abuse." *Id*. At Step Three, the ALJ found that Scrivner's impairments did not meet a Listing. (R. 15-16).

The ALJ determined that Scrivner had the RFC to perform medium work. (R. 16). She stated that Scrivner could "have only occasional interaction with the public. She can interact with coworkers and supervisors sufficiently for work purposes and adapt to most routine work place changes. She is restricted to simple and routine tasks." *Id*. At Step Four, the ALJ found that Scrivner was not able to perform any past relevant work. (R. 19). At Step Five, the ALJ found that there were a significant number of jobs in the national economy that Scrivner could perform, taking into account her age, education, work experience, and RFC. *Id*. Therefore, the ALJ found that Scrivner was not disabled at any time from October 1, 2006 through the date of her decision. (R. 20).

### Review

Scrivner makes arguments related to the proper consideration of the medical evidence, inclusion of all impairments, credibility, and obesity. The Court finds that the ALJ's decision must be reversed because it did not give sufficient reasons for finding Scrivner less than fully credible. Because reversal is required due to errors in the ALJ's credibility assessment, the other issues raised by Scrivner are not addressed.

Credibility determinations by the trier of fact are given great deference. *Hamilton v. Secretary of Health & Human Services,* 961 F.2d 1495, 1499 (10th Cir. 1992).

> The ALJ enjoys an institutional advantage in making [credibility determinations]. Not only does an ALJ see far more social security cases than do appellate judges, [the ALJ] is uniquely able to observe the demeanor and gauge the physical abilities of the claimant in a direct and unmediated fashion.

*White v. Barnhart,* 287 F.3d 903, 910 (10th Cir. 2002). In evaluating credibility, an ALJ must give specific reasons that are closely linked to substantial evidence. *See Kepler v. Chater*, 68 F.3d 387, 391 (10th Cir. 1995); Social Security Ruling 96-7p, 1996 WL 374186. "[C]ommon sense, not technical perfection, is [the] guide" of a reviewing court. *Keyes-Zachary v. Astrue*, 695 F.3d 1156, 1167 (10th Cir. 2012).

This reviewer has been unable to find any discussion of Scrivner's credibility that approaches the required standard of specific reasons closely linked to substantial evidence. The only language addressing credibility is a boilerplate provision that Scrivner's "statements concerning the intensity, persistence and limiting effects of [her] symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment." (R. 18). After this introductory statement, the ALJ discussed Scrivner's chest pain and then Dr. Fritz's mental status examination. *Id.* She then said that she gave great weight to the reports of Dr. Smith and Dr. Woodcock. (R. 18-19). None of this brief discussion addressed Scrivner's credibility, and there was no other discussion of her credibility in the ALJ's decision.

The use of boilerplate language in Social Security disability cases was discussed and discouraged by the Tenth Circuit in *Hardman v. Barnhart*, 362 F.3d 676, 679 (10th Cir. 2004). The court explained that boilerplate language was a conclusion in the guise of findings, whereas the task of the ALJ is to explain the specific facts of the case before him and how those facts led him to his decision. *Id.* Boilerplate statements fail to inform the reviewing court "in a

meaningful, reviewable way of the specific evidence the ALJ considered." *Id. See also Bjornson v. Astrue,* 671 F.3d 640, 644-46 (7th Cir. 2012) (opinion authored by Judge Posner criticizing Social Security Administration's use of "templates" in ALJ disability decisions). Here there was no "more thorough" analysis that followed the ALJ's use of boilerplate language, and the lack of that analysis requires reversal. *Hardman*, 362 F.3d at 678-81.

There may have been sufficient reasons with supporting evidence that could justify an adverse credibility determination. The undersigned finds that the Court cannot make that determination without impermissibly substituting its judgment for that of the ALJ. *Allen v. Barnhart*, 357 F.3d 1140, 1144 (10th Cir. 2004) (court is not in a position to draw factual conclusions on behalf of the ALJ) (further quotations omitted). The Court also cannot supply reasons to support the ALJ's credibility assessment that were not given by the ALJ herself, as the Commissioner appears to suggest. Judicial review of an agency decision is limited to the analysis offered in the ALJ's decision, and it is improper for a reviewing court to offer a "post-hoc rationale" in order to affirm. *Carpenter*, 537 F.3d at 1267.

Because the errors of the ALJ related to the credibility assessment require reversal, the undersigned does not address the remaining contentions of Scrivner. On remand, the Commissioner should ensure that any new decision sufficiently addresses all issues raised by Scrivner.

This Court takes no position on the merits of Scrivner's disability claim, and "[no] particular result" is ordered on remand. *Thompson v. Sullivan*, 987 F.2d 1482, 1492-93 (10th Cir. 1993). This case is remanded only to assure that the correct legal standards are invoked in reaching a decision based on the facts of the case. *Angel v. Barnhart*, 329 F.3d 1208, 1213-14 (10th Cir. 2003), *citing Huston v. Bowen*, 838 F.2d 1125, 1132 (10th Cir. 1988).

**Conclusion**

Based upon the foregoing, the Court **REVERSES AND REMANDS** the decision of the Commissioner denying disability benefits to Claimant for further proceedings consistent with this Order.

Dated this 19th day of June 2013.

Paul J. Cleary
United States Magistrate Judge